The UNITED METHODIST CHURCH,
BALTIMORE ANNUAL
CONFERENCE, Appellant,

v.

John R. WHITE, Appellee.

No. 88–1100.

District of Columbia Court of Appeals.

Argued Oct. 2, 1989.

Decided March 5, 1990.

Thomas E. Starnes, with whom Thomas R. Kline, Washington, D.C. was on brief, for appellant.

Clement Theodore Cooper, Washington, D.C. for appellee.

Before ROGERS, Chief Judge, and FERREN and BELSON, Associate Judges.

ROGERS, Chief Judge:

Appellant United Methodist Church, Baltimore Annual Conference (UMC) appeals from denials of its motions to dismiss the complaint and for reconsideration on the ground that the Free Exercise and Establishment Clauses of the First Amendment of the Constitution preclude civil courts from adjudicating religious disputes involving the qualifications or fitness of clergy. Appellee John R. White alleged that he was wrongfully discharged as a minister in the United Methodist Church, Baltimore Annual Conference and sought his reinstatement in addition to compensatory and punitive damages for alleged breaches of his employment contract. We reverse.

I

John R. White was an ordained minister in the United Methodist Church, Baltimore Annual Conference.[1] He served as pastor at a number of United Methodist churches from 1970–85, and as a chaplain in the United States Air Force. In October 1984 he became severely depressed and emotionally disturbed. He was hospitalized for several months in the psychiatric ward at

---

1. The United Methodist Church is composed of numerous annual conferences. Each conference covers a particular geographic jurisdiction and meets annually. The Baltimore Annual Conference covers Washington, D.C., most of Maryland and part of West Virginia. A General Conference, composed of ministers and lay members, meets every four years to discuss and pass legislation on issues of concern to United Methodists.

George Washington University Medical Center. On November 13, 1984, the Executive Committee of the Board of Ministry voted to place Rev. White on a leave of absence pursuant to ¶ 450.1 of *The Book of Discipline of the United Methodist Church, (Discipline)*. In addition, pursuant to the requirements of the *Discipline* that a minister on leave of absence may not exercise his ministry beyond the confines of his local church and that his ecclesiastical endorsement must be withdrawn, the Division of Chaplains and Related Ministries, the General Board of Higher Education,[2] and the Ministry of the United Methodist Church sent a letter on September 16, 1985, to the Air Force withdrawing Rev. White's ecclesiastical endorsement.

A year and one half later, on May 13, 1987, the Baltimore Conference Board of Ministry recommended that Rev. White's conference membership be terminated. In accordance with the *Discipline*, ¶ 455.1(f), Rev. White was sent notice of the Board of Ministry's action by letter dated May 14, 1987. The contents of the letter were read to him on June 3, 1987. Eight days later, his counsel wrote to the Chairman of the Conference Relations Committee advising that he had "reviewed, in detail, the applicable provision of the Book of Discipline." Although Rev. White had only ten days after receiving notice of the termination of his conference membership to request a church trial, counsel did not request a church trial.

Rev. White's ministerial membership in the Baltimore Conference was terminated on June 9, 1987, pursuant to a vote of the Ministerial Executive Session of the 1987 Annual Conference due to "disobedience to the Order and Discipline of the United Methodist Church." On June 24, 1987, through counsel, he requested a church trial which was denied as untimely.

On March 28, 1988, Rev. White sued UMC for breach of contract seeking reinstatement of his ecclesiastical endorsement, a letter of apology, and compensatory and punitive damages. He also sought a declaration that he had exhausted his administrative remedies and demanded a jury trial. His complaint alleged that he was wrongfully discharged and divested of his ecclesiastical endorsement, denied related hospital and retirement benefits and compensation, and otherwise injured. UMC filed a motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. The motion was denied on May 20, 1988. On June 6, 1988, UMC filed a motion for reconsideration or for allowance of an immediate appeal, which was also denied on July 20, 1988. UMC filed a notice of appeal on August 20, 1988.[3] Rev. White then filed a motion to dismiss the appeal on the ground that the order appealed from was not a final order. This court initially dismissed the appeal for lack of jurisdiction, but subsequently granted UMC's petition for rehearing.

II

■ *Jurisdiction.* Under D.C.Code § 11–721(a)(1) (1988), this court has jurisdiction to review all "final orders and judgments" of the Superior Court. In addition, appeals from certain interlocutory orders are permitted where they have a final and

---

**2.** The General Board of Higher Education is a Tennessee corporation that is not under the auspices or control of the Baltimore Annual Conference.

**3.** Rev. White contends that UMC's appeal was untimely and should have been filed, pursuant to D.C.Code § 11–721(d) and D.C.App.R. 5(a), within 10 days of the trial judge's denial of the motion for reconsideration and allowance of an immediate appeal. These provisions apply only when the trial judge grants a request to certify an interlocutory appeal. D.C.Code § 11–721(d); D.C.App.R. 5(a).

UMC filed its appeal as a matter of right from the trial judge's decisions pursuant to D.C.Code § 11–721(a) and D.C.App.R. 4. Under Rule 4(a)(2), the timely filing of a motion to alter or amend judgment has the effect of tolling the thirty-day period for filing an appeal. The May 20, 1988, order (docketed May 24, 1988) was mailed to the parties. *See* Super.Ct.Civ.R. 6(e) (3 additional days). Hence, the motion for reconsideration was timely filed on June 6, 1988, and the time to appeal was tolled. The trial judge denied UMC's motion for reconsideration on July 20, 1988, and the appeal, filed on August 20, 1988, was timely.

irreparable effect on important rights of the parties.[4] *See Stein v. United States,* 532 A.2d 641, 643 (D.C.1987) (citing *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 545, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949)). *See also Jenkins v. Smith,* 535 A.2d 1367 (D.C.1987) (en banc) (affirming *Frost v. People's Drug Store, Inc.,* 327 A.2d 810, 812 (D.C.1974) (interlocutory appeal from denial of motion to dismiss for *forum non conveniens* )). To come within the narrow exception to the rule of finality as a predicate for appellate jurisdiction, there are three prerequisites:

> First, it "must conclusively determine the undisputed question"; second, it must "resolve an important issue completely separate from the merits of the action"; third, it must be "effectively unreviewable on appeal from a final judgment."

*Stein, supra,* 532 A.2d at 643 (quoting *Flanagan v. United States,* 465 U.S. 259, 265, 104 S.Ct. 1051, 1054, 79 L.Ed.2d 288 (1984)). We hold that the denial of UMC's motion to dismiss on grounds of constitutional immunity meets these three tests.

First, the trial judge, by denying UMC's motion to dismiss and motion for reconsideration, has conclusively determined the disputed issue of UMC's claim of immunity from suit in the civil courts.

Second, the very nature of an immunity claim makes it collateral to and separable from the merits of Rev. White's claim of wrongful termination. The issue in this appeal is whether Rev. White's claims fall, as a matter of law, within the scope of UMC's First Amendment immunity. In contending that the First Amendment protects the church from judicial inquiry into Rev. White's suit, UMC does not address the merits of the assertions in Rev. White's complaint against the church. Rather, UMC contests the authority of the civil courts to adjudicate a dispute between UMC and its pastor. Thus, the elements of UMC's immunity claim are clearly independent of any liability that it may bear for Rev. White's termination. Therefore, the issues raised by the trial judge's denial of UMC's motion to dismiss are collateral to Rev. White's cause of action and will not "affect, or ... be affected by, decision of the merits of this case." *Cohen v. Beneficial Indus. Loan Corp., supra,* 337 U.S. at 546, 69 S.Ct. at 1225.

Finally, UMC's claim of immunity under the Free Exercise Clause and the Establishment Clause of the First Amendment of the Constitution will be irreparably lost if not adjudicated before trial. Although *Stein* concerned an appeal from denial of a motion to dismiss on grounds of statutory immunity, the Supreme Court has extended the same logic to constitutional immunities and guarantees. *See Mitchell v. Forsyth,* 472 U.S. 511, 525, 105 S.Ct. 2806, 2814, 86 L.Ed.2d 411 (1986) (essence of governmental immunity claim is freedom from legal liability for immunized acts); *Helstoski v. Meanor,* 442 U.S. 500, 508, 99 S.Ct. 2445, 2449, 61 L.Ed.2d 30 (1979) (purpose of Speech & Debate Clause immunity to prevent representative from defending themselves); *Abney v. United States,* 431 U.S. 651, 658–61, 97 S.Ct. 2034, 2039–41, 52 L.Ed.2d 651 (1977) (denial of double jeopardy claim would undermine guarantee not to be tried twice for the same crime).

The First Amendment's Establishment Clause and Free Exercise Clause grant churches an immunity from civil discovery and trial under certain circumstances in order to avoid subjecting religious institutions to defending their religious beliefs and practices in a court of law. *See NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 503, 99 S.Ct. 1313, 1320, 59 L.Ed.2d

---

**4.** Appellee contends that court orders, not otherwise final, are interlocutory and therefore not appealable. However, the cases on which he relies are distinguishable and support the proposition stated by appellant. *Mills v. Cosmopolitan Ins. Agency,* 442 A.2d 151 (1982) (appeal from denial of costs for appeal premature, not a final order); *but see McQueen v. Blacknall,* 547 A.2d 172, 175 (D.C.1988) (en banc) (protective order in landlord and tenant cases is an appealable interlocutory order); *Crown Oil and Wax Co. of Delaware v. Safeco Ins. Co. of Am.,* 429 A.2d 1376 (1981) (appeal from denial of motion to dismiss for *forum non conveniens* granted); *Jenkins v. Parker,* 428 A.2d 367 (1981) (denial of motion to quash an attachment is not an appealable order unless it changed or affected the possession of property).

533 (1979). Obviously, if Rev. White's claims fall within the scope of UMC's immunity, once exposed to discovery and trial, the constitutional rights of the church to operate free of judicial scrutiny would be irreparably violated. In short, UMC's immunity claim can be exercised, if at all, only before trial, and must be reviewed pretrial or it can never be reviewed at all. *See Mitchell v. Forsyth, supra,* 472 U.S. at 526, 105 S.Ct. at 2815.

Accordingly, we hold that the denial of UMC's motion to dismiss on grounds of constitutional immunity is immediately appealable as a collateral order, and that we have jurisdiction to review it in this pretrial appeal.

## III

*Immunity.* The United States Supreme Court has long held that, generally, civil courts are not a constitutionally permissible forum for review of ecclesiastical disputes. *Serbian Eastern Orthodox Diocese v. Milivojevich (Serbian),* 426 U.S. 696, 710, 96 S.Ct. 2372, 2381, 49 L.Ed.2d 151 (1976); *Presbyterian Church v. Hull Memorial Presbyterian Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church,* 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952); *Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929); *Watson v. Jones,* 80 U.S. (13 Wall.) 666, 20 L.Ed. 485 (1871). There are limited exceptions, as, for example, where an employee has provided a purely secular service for the church, civil courts have extended jurisdiction. *See Corporation of Presiding Bishop v. Amos,* 483 U.S. 327, 330–32, 107 S.Ct. 2862, 2865–66, 97 L.Ed.2d 273 (1987) (building engineer possessed no duties remotely related to religious beliefs or duties); *EEOC v. Pacific Press Publishing Ass'n,* 676 F.2d 1272 (9th Cir.1982) (Civil Rights Act applied to editorial secretary in a church publishing house); *EEOC v. Mississippi College,* 626 F.2d 477 (5th Cir. 1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981) (Civil Rights Act applied to secular employment deci-sions of religious institution). Also, in extremely limited circumstances, courts have adjudicated conflicts between church and clergy when the issue has been whether church officials had the authority to effect a pastor's discharge, as distinct from whether the church's decision was correct *Vincent v. Raglin,* 114 Mich.App. 242, 318 N.W.2d 629, 631 (1982) (church trustees did not have authority to remove pastor). *See Stony Island Church of Christ v. Stephens,* 54 Ill.App.3d 662, 12 Ill.Dec. 299, 369 N.E.2d 1313 (1977) (elders had authority to terminate pastor's employment); *Antioch Temple, Inc. v. Parekh,* 383 Mass. 854, 422 N.E.2d 1337 (1981) (court gave effect to decision of congregation); *Holt v. Trone,* 341 Mich. 169, 67 N.W.2d 125 (1954) (elders had no authority to remove pastor because congregation had removed elders); *Tate v. Walker Memorial Baptist Church,* 282 A.D. 675, 122 N.Y.S.2d 182 (1953) (congregation as a whole had authority to expel minister); *Walker Memorial Baptist Church v. Saunders,* 285 N.Y. 462, 35 N.E.2d 42 (1941) (plaintiff had no power to expel minister).

▮ Rev. White does not contend that he was removed from the United Methodist Church, Baltimore Annual Conference by a person without the authority to remove him. Rather, he maintains that he was wrongfully terminated as a result of mistaken judgments by church officials and misapplication or violation of the *Discipline,* and that he was wrongfully denied hospital and retirement benefits and compensation during his illness. He seeks judicial evaluation of the basis for the church's decision to terminate him and, ultimately, an order directing reinstatement of ecclesiastical endorsement by the UMC. In addition, he seeks compensation for the benefits which he alleges were promised under the terms of his negotiated employment contract.

Despite civil court adjudication in the limited circumstances noted above, it is well established that a civil court may not interfere in matters of church government, as well as matters of faith and doctrine. *Kedroff v. St. Nicholas Cathedral of Russian*

*Orthodox Church, supra,* 344 U.S. at 116, 73 S.Ct. at 154. Such ecclesiastical decisions are generally beyond the jurisdiction of secular courts. *Rayburn v. General Conf. of Seventh–Day Adventists,* 772 F.2d 1164, 1167 (4th Cir.1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). Indeed, "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchial polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law." *Serbian Eastern Orthodox Diocese v. Milivojevich, supra,* 426 U.S. at 713, 96 S.Ct. at 2382.

The right to choose a minister without judicial intervention "underlies the well-being of religious community, for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and the world at large." *Rayburn v. General Conf. of Seventh–Day Adventists, supra,* 772 F.2d at 1167–68. *See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, supra,* 344 U.S. at 116, 73 S.Ct. at 154. Any attempt by the civil courts to limit the church's choice of its religious representatives would constitute an impermissible burden on the church's First Amendment rights. *Rayburn v. General Conf. of Seventh–Day Adventists, supra,* 772 F.2d at 1168. *See Kaufmann v. Sheehan,* 707 F.2d 355, 358 (8th Cir.1983). *See also McClure v. Salvation Army,* 460 F.2d 553, 560 (5th Cir.1972) ("[a]n investigation and review of such matters of church administration and government as a minister's salary, his place of assignment, and his duty, ... could only produce by its coercive effect the very opposite of that separation of church and State contemplated by the Constitution."). Consequently, courts have concluded that employment disputes concerning the status of pastors are inherently ecclesiastical and cannot constitutionally be subject to review. *See Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1356 (D.C.Cir.1990) (pastor's suit for

violation of federal age discrimination statute dismissed); *Rayburn v. General Conf. of Seventh–Day Adventists, supra,* 772 F.2d 1164 (minister's claims of race and sex discrimination dismissed); *Simpson v. Wells Lamont Corporation,* 494 F.2d 490 (5th Cir.1974) (United Methodist minister's suit for wrongful discharge dismissed); *Hutchinson v. Thomas,* 789 F.2d 392 (6th Cir.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986) (Methodist minister's common law claims challenging forced retirement by the church dismissed); *Knuth v. Lutheran Church Missouri Synod,* 643 F.Supp. 444 (D.Kan.1986) (discharged pastor's claim of breach of contract and implied duty of good faith and fair dealing, seeking damages for removal and attempt to regain pastoral status, dismissed); *Hafner v. Lutheran Church–Missouri Synod,* 616 F.Supp. 735 (N.D.Ind. 1985) (pastor's suit for alleged denial of benefits based on interpretation of church synod constitution dismissed). Rev. White's complaint for reinstatement and damages resulting from his divestment fall well within those matters protected from secular judicial scrutiny.

The *Discipline* of the United Methodist Church is a religious document which this court cannot construe without usurping the rights of the UMC to construe its own law. *Knuth v. Lutheran Church Missouri Synod, supra,* 643 F.Supp. at 448. A secular evaluation of procedures that ecclesiastical or canon law requires the church to follow is precisely the type of inquiry the First Amendment prohibits. *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. at 713, 96 S.Ct. at 2382. The grounds for Rev. White's suit are set forth in the *Discipline* and arise from his claim that the church failed to comply with its own regulations. His brief in this court is replete with religious interpretations, demonstrating the impossibility of resolving his divestment claims without construing church doctrine. Accepting Rev. White's allegations as true for the purposes of this appeal,[5] this court, in order to review the merits of

---

**5.** For purposes of ruling on the motion to dismiss, the allegations of his complaint must be

taken as true and liberally construed. *McBryde v. Amoco Oil Co.,* 404 A.2d 200, 202 (D.C.1979).

his claims would necessarily become entangled in matters of a highly religious nature, issues at the core of internal church discipline, faith and church organization. *Kaufmann v. Sheehan, supra,* 707 F.2d at 358. Accordingly, we hold that the UMC is immune from defending its decision to terminate Rev. White.

█ This does not end our consideration, however, for Rev. White alleges that while he was a member of the UMC he was denied benefits to which he was entitled pursuant to his employment contract with UMC. Specifically, he alleges that when he was hospitalized, UMC breached his contract by improperly depriving him of hospital and sick benefit coverage as well as compensation to which he was entitled, and upon termination, by denying him retirement benefits. Rev. White does not rely on a written contract,[6] but alleges that his ordination and various church appointments give rise to an implied contract and implied covenants of good faith and fair dealing. *See Bloomgarden v. Coyer,* 156 U.S. App.D.C. 109, 116, 479 F.2d 201, 208 (1973). *Cf. Carnes v. Smith,* 236 Ga. 30, 222 S.E.2d 322 (1976) (trust arises from provisions of the church book of discipline).

While the Supreme Court has long held that civil courts are constitutionally prohibited from inquiring into allegations that would involve church polity and practices, the Court also has long recognized in limited circumstances that the church is not above the law. *See, e.g., Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) (neutral principles applied to church property dispute). Federal circuit courts of appeal have held that the church is not above the law and may be held liable for valid contracts. *Minker v. Baltimore An-*

*nual Conference of United Methodist Church, supra,* 894 F.2d at 1358–59.[7] *See Rayburn v. General Conf. of Seventh–Day Adventists, supra,* 772 F.2d at 1171. *See also EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d 277 (5th Cir.1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982); *EEOC v. Pacific Press Publishing Ass'n., supra,* 676 F.2d 1272; *EEOC v. Mississippi College, supra,* 626 F.2d 477; *Whitney v. Greater New York Corporation of Seventh–Day Adventists,* 401 F.Supp. 1363 (S.D.N.Y.1975).[8]

As styled in his complaint, Rev. White has not clearly delineated how his benefit claims are separate from his ecclesiastical claims. In describing the nature of his contract he relies on the "contract of the highest degree of integrity" arising as a result of his ordination, which contract he claims he fully performed. Consequently, in order to reach Rev. White's contention that he was improperly denied benefits promised under his contract, the civil court would necessarily inquire into whether UMC accorded its minister the benefits to which he was entitled under a contract deriving from the *Discipline.* Rev. White does not allege the absence of a decision by church officials or tribunal on these matters or that they do not involve questions of discipline, organization, faith or religious law. *See, Watson v. Jones, supra,* 80 U.S. (13 Wall.) at 727, 729, 20 L.Ed. 485 (church decision on discipline, faith, or ecclesiastical rule, custom or law must be accepted by civil courts). Indeed, his request for a declaration that he has exhausted his administration remedies suggests that there are such church remedies available to respond to his claims of entitlement to certain benefits.[9]

6. Rev. White relies on *Jewish Center of Sussex County v. Whale,* 86 N.J. 619, 432 A.2d 521 (1981), and *Kupperman v. Congregation Nusach Sfard,* 39 Misc.2d 107, 240 N.Y.S.2d 315 (N.Y. Sup.Ct.1963), cases which involved written employment contracts. See note 11, *infra.*

7. In *Minker* the pastor claimed a contractual breach relating to his assignment to a pastorage. His claims allegedly arose from a contract claim separate and apart from church policy or a church religious document. *See* 894 F.2d at

1360–61. In this respect, Rev. White's claim is readily distinguishable from that of Rev. Minker.

8. See note 10, *infra.*

9. We do not reach the issue of whether Rev. White has exhausted his administrative remedies. In his complaint, however, he refers to the fact that he appeared, without counsel, before the Executive Conference. His counsel also wrote to the chair of UMC's Conference

Although UMC does not concede that it had a contract with Rev. White, neither does it contend that it was not obligated to live up to its obligations to Rev. White. Rather UMC maintains that because Rev. White is a minister, these are matters of inquiry from which the civil courts are precluded. It relies on *Dowd v. Society of St. Columbans,* 861 F.2d 761; *McClure v. Salvation Army, supra,* 460 F.2d at 560 and *Hafner v. Lutheran Church–Missouri Synod, supra,* 616 F.Supp. at 737. These cases are not exactly on point, however. *McClure* involved a request that the court evaluate church practices with respect to sex discrimination. The contract claims for health and disability benefits in *Hafner* arose from a broad provision of a religious document to determine whether such benefit promises fell within that provision. *Dowd* is of little assistance since the decision turned on inadequate factual allegations of wrongdoing by the defendant. Here, by contrast, Rev. White seeks, in an otherwise adequate complaint, *see* Super. Ct.Civ.R. 8(a), only to hold UMC to promises it allegedly made as the result of its own policy choices in the course of negotiating a contract with him.

Nevertheless, we conclude that a determination of Rev. White's benefit claims would involve more than simply the secular questions of whether such promises were made by UMC and, if so, whether the benefits were properly denied to Rev. White. His complaint links the circumstances of his contractual rights and alleged breaches to the circumstances surrounding his ordination and divestment of ecclesiastic endorsement. Rev. White's benefit claims are, as UMC contends, ancillary to his claim of improper divestment. Courts have, so far as we have found, unanimously recognized that such claims involve matters of church governance and are not purely secular matters, and in the absence of church invocation of the civil courts, resolution of such disputes is properly for church officials. *See, e.g., Hafner v. Lutheran Church–Missouri Synod, supra,* 616 F.Supp. at 739; *McClure v. Salvation Army, supra,* 460 F.2d at 559; *Dowd v. Society of St. Columbans, supra,* 861 F.2d at 764. *See also Gipe v. Superior Court for County of Orange,* 124 Cal. App.3d 617, 628, 177 Cal.Rptr. 590, 595.[10] Even in situations in which a written contract has been involved, the basis for civil court jurisdiction in the cases on which Rev. White relies, turned on circumstances

Relations Committee expressing concern about Rev. White's hospital and disability benefits, referring in the letter to the exhaustion of administrative remedies.

**10.** In *Gipe* the court held that it had jurisdiction to determine whether severance pay had been conditionally promised to a minister and, if so, whether the conditions had been met, viewing the dispute as involving the ownership or right to property. The cases relied on in *Gipe* however, involve situations in which the church sought the intervention of the civil court or the judgment of the civil court was reversed. *See Gipe v. Superior Court for County of Orange, supra,* 124 Cal.App.3d at 628, 177 Cal.Rptr. at 595 (citing *Eldership v. Church of God at Sharpsburg,* 396 U.S. 367, 368, 90 S.Ct. 499, 500, 24 L.Ed.2d 582 (1970) (regional church sued local churches and others to prevent withdrawal from regional church and to determine control of church property); *Presbyterian Church v. Hull Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969) (injunction granted to local churches to enjoin trespass on church property reversed since based on civil court interpretation of church doctrine); *Presbytery of Riverside v. Community Church of Palm Springs,* 89 Cal.App.3d 910, 920, 152 Cal.Rptr. 854, 859, *cert. denied,* 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979) (neutral principles of law applied to property dispute between general church and local church); *Samoan Congregational Christian Church in the United States v. Samoan Congregational Christian Church of Oceanside,* 66 Cal.App.3d 69, 75–77, 135 Cal. Rptr. 793, 796–98 (1977) (association of churches sued to impress trust on assets of member church); *Metropolitan Baptist Church of Richmond, Inc. v. Younger,* 48 Cal.App.3d 850, 858–59, 121 Cal.Rptr. 899, 903–05 (1975) (church petitioned for authority to distribute liquidated assets)). *See also Stony Island Church of Christ v. Stephens,* 54 Ill.App.3d 662, 12 Ill.Dec. 299, 369 N.E.2d 1313, 1317 (1977) (church sued to remove minister from church premises and to restrain interference with church property; vacation of arbitration award concerning contractual dispute regarding termination of services and right to possession of church property not involving any element of religion). Consequently, *Gipe* can offer little solace to Rev. White.

not present here.[11]

Accordingly, the order denying the motion to dismiss the complaint is reversed and the case remanded to the trial court with instructions to dismiss the complaint.

---

**11.** For example, in *Kupperman v. Congregation Nusach Sfard, supra,* 39 Misc.2d 107, 240 N.Y. S.2d 315, a rabbi sued a congregation over his discharge and for salary that was due and sought injunctive relief. The court, in entering judgment for the rabbi, held that because the congregation had independent authority to call and remove its rabbi, the structure of the religious faith meant that the dispute at issue was a temporal matter concerning the authority to discharge and whether notice, as required under the contract, was properly given. In granting injunctive relief, the court, in effect, affirmed the rabbinical tribunal's decision in favor of the rabbi.

In *Jewish Center of Sussex County v. Whale,* 397 A.2d 712 (N.J.1978), the Jewish Center sought to rescind a contract with a rabbi on the ground that he had failed to disclose his prior criminal record and disbarment as an attorney, and to dismiss the rabbi's counterclaim based on breach of contract and specific performance.

*Forest Hills Early Learning Center v. Grace Baptist Church, supra,* 846 F.2d 260, involved a challenge brought by secular day care centers to a state statute exempting religiously affiliated child centers from state licensing requirements. The Fourth Circuit, citing *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos (Amos),* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), held that the statute did not violate the establishment clause, reversing the District Court decision that state licensing requirements would not interfere with church-run child care centers and free exercise of religion and were justified by compelling state interest to the extent that they did. The Fourth Circuit concluded that there was no principled basis on which to distinguish between the result reached in *Amos, supra,* involving employment practices in a gymnasium, and "prevent[ion of] state interference with church programs that provide education and child care programs." 846 F.2d at 164.